Good morning and welcome to the Fourth Circuit. In our first case, a couple of items to take up preliminarily. If there are to be any references to the jurors, you should use the numbers. You are not to use their names or any other So, Mr. Wilkins will go first, followed by Ms. Stoughton, and then Ms. Limehouse will give the opening for the cross appeal. Then we'll come back to Mr. Neiman, and Ms. Limehouse will be last. So, hopefully we'll all remember that. Mr. Wilkins, we're glad to hear you in the United States v. Laffitte. Thank you, Your Honor. May it please the Court, I'm Billy Wilkins and my colleague John Neiman, and I represent Russell Laffitte. After nine days of testimony, the jury began deliberating on the day before the courthouse was scheduled to be closed for three days for Thanksgiving. The jury deliberated all day and into the evening without reaching a verdict. Sometime around 830 that evening, the district judge in private swapped out two jurors. This new panel of jurors retired and in lightning speed reached a verdict. In private, but with the consent of the parties that he questioned those jurors, correct? Yes. Appellant consented to the questioning of the present. Yes, sir, he did. I'd like to spend my time this morning addressing these critical and extraordinary jury dismissals, including what was said and just as importantly what was not said just before and just after these two jurors were told to go home. Now, shortly after 8 o'clock, the judge began to read, partially read, from four notes sent by the jurors. The notes were not shown to Laffitte or to his attorneys, nor was the identity of the jurors who signed those notes disclosed. Was there any objection to not showing the notes to the lawyers? No, the judge said he'd fully disclosed all of his notes. But did any of the lawyers say, with respect, Your Honor, I'd like to see the notes? No, they did not. I thought the district court judge at one point said that he didn't know who the numbered jurors were. He said that, but of course their numbers were on the notes and the jury numbers were on the notes. He did say, I fully disclosed my notes and no, I don't know who these jurors are. To answer your questions and remarks, Judge, I question whether a lawyer can be faulted when the judge says, I've disclosed everything. Well, Judge, I'm not sure. Let me see those notes to make sure you have disclosed everything. But in any event, the judge did not disclose that on the second note, the word pressured in the sentence, I'm being pressured to change my vote, had been underlined twice, nor did he disclose the last sentence in the fourth note. In reading these notes, the judge commented that my instinct is that we have alternates and we should get a verdict. So are you taking the two jurors in tandem or are you going to differentiate between them? I'll differentiate, Your Honor. They stand alone. Each is separate. Each is a separate violation of the Constitution and a violation of either one compels, in my opinion, a new trial. Why don't we start down that road of taking one and then the other because it seems to me there are different aspects that apply to the different jurors. All right, I'll do that. Referring to whom we now know is Juror 88, the author of the fourth note. Without explanation, I think I'm 99% sure this is the anxiety. I guess in my head there's the medication juror and the anxiety juror. This is the anxiety juror we're talking about? That's correct, Your Honor. I just want to make sure I know what juror we're talking about. The word anxiety was used because that's how the parties began to identify them in the colloquy with the court. 93 is the needs medication. Yes, sir. So now we're on 88. 88. Anxiety. The judge said, first of all, without explanation, it would be a huge mistake to bring this juror, 88, into the courtroom. He then stated, baby, it's the best way for me to do is to speak to the jurors and create a record. And then he said it twice. And the third time he said, do I have your consent for me creating a record to question the jurors? And both parties said, we consent. And the government says, yes, we consent if the questioning, that is the, if he is, meaning the questioning, is on the record. As he was leaving the courtroom, the judge says, I'm going to take action. Everybody happy with that? Well, juror 88, as well as 93, but I'm concentrating on 88. Now we're already on the street. When the judge entered the courtroom and said, I'll dismiss these jurors. Lafitte's attorney immediately said, I object to the dismissal of this juror, juror 88. He said, I thought we were just going to interview them. And co-counsel then said to the judge, Mr. Daniels objection is akin to moving for a mistrial. And the judge responded, it's not a hung jury. I have alternates. Well, just because a judge or court or any court has alternates does not mean that a properly impaneled jury cannot become a hung jury. Indeed, I submit to the court that every defendant in every case, under circumstances like this case, is entitled to a hung jury if the panel cannot reach a unanimous verdict. So can I ask you, can I ask you what strikes me as the hardest question in this case for me? So let's just pause it on juror 88. I don't think you have any plausible argument. I don't, I don't hear you making it. I don't think you have any plausible argument that the district court did anything wrong by talking to juror 88 ex parte because the party's all expressly consented to that happening. And then the government said it needs to be on the record. It is. I'm literally looking at the transcript of the district court's conversation with juror 88. So I get that. And then at the end of this colloquy, the court asks juror 88, do you feel you can perform or do you want me to replace you with an alternate? Sorry, that's not the important part. He says, the court says, this is at SJA 3311. The issue is, are you able to perform your duties as a juror? Juror 88, at this point, no. I guess my real difficult question is, what is the district court supposed to do at that point? Because if a juror says they can't perform their duties as a juror, I don't understand how he can't dismiss that juror at that point. You can't let someone be on a jury who's told you they can't perform their duties as a juror. What is he supposed to do when she says that? Well, I'll say what he's supposed to do, Your Honor. First of all, he asked the jury, do you want me to replace you? No, no. I'm asking in response, when a juror says in response to, can you perform your duties as the juror, the juror says, no. Do you think there's any world in which the district court doesn't have to replace that juror? How would it not be reversible error to not reverse a juror who says they can't perform their duties? He should do what every circuit in this country that has addressed this issue says you should do. That's the D.C. Circuit, the 2nd, the 3rd, the 6th, the 9th, and the 11th. All have held that a district court may not dismiss a jury during deliberations if there is a reasonable possibility that the request to be dismissed stems from that juror's feelings about the sufficiency of the government's case. I assume your answer to that goes to the two questions or three questions before the ones Judge Hytens asked, where the juror says, I started to feel anxious due to some of the reactions to my decision. I don't want to be replaced. I'm usually very strong, but I don't want to be trialed for my decision. Is it your argument at that point that the district court judge should have cut it off? At that point the judge should have said several things he could have done, but he had an obligation to explain to that juror that you have a duty to serve, and I, as the trial judge, have a duty to see that you continue to serve, and I have an obligation to do whatever is necessary to relieve whatever is happening in that jury room that's making you feel like because of your decisions you're being put on trial yourself. He had a number of things he could have done. One, he could have brought the lawyers into the interview room so they could see what was happening, observe the judge questioning the jury, and make suggestions to the court as to what the proper course of action would be, including reminding the court that a juror may not be dismissed if her decision, her feelings stem from her decisions about the adequacy of the government's case or what he could have done, too . . . If I remember correctly, when the district judge came back in and he announced his decision, the counsel for Mr. Lafitte made his objection, the district court judge said something to the effect of, what else was I supposed to do? She was shaking so badly, she could hardly answer me. It just looks like a horrible dilemma for the district court judge, and now here we are, way after the fact, looking at it on a transcript and not with what the judge was actually faced. The judge did come back and he said, I didn't think I had a choice but to dismiss her. But his choice was to send the juror back to the room, the one choice, with proper instructions to the jury about how they had to behave toward one another. Okay, but again, once the juror said, I can't perform my duties, if the juror had stayed on the jury and the jury had convicted, the defense would have had an extremely strong Sixth Amendment objection to letting a person stay on the jury who said they can't perform their duties. I just don't think he had any choice but to dismiss her. Maybe what he needed to do was declare a mistrial at that point, but I guess I'll just say it does not strike me as plausible that he had to, much less even could, have left a juror on the jury once the juror said, I can't perform my duties. The judge said to the jury, well, it's your call. It's your call. You can either stay on this jury and you do what best you can back in the jury room with those other jurors or you can just leave the courthouse and go home. That's not a choice a juror can be given. But that's before he said what I think is the most important question, the one that you, I understand, do not want to talk about, is the part where he said, at this point, are you capable of performing your duties? And the person says, no. As the Eleventh Circuit said in the Abel case, Judge, it's a tough legal standard that must be strictly enforced to protect the basic rights of every defendant. Otherwise, a unanimous verdict, the right to one, becomes merely an illusion. This judge could have suspended for the evening, asked me, if we suspend for the evening and come back tomorrow, I'll charge the jury that they've got to behave and be cordial and treat you with dignity, just like this court has said in the Sawyer case. Every juror has a right to speak without being coerced. That's what the judge should have done. He has to do everything he can to keep this juror on the panel. Otherwise, there's no such thing as a unanimous verdict as the Constitution describes it. What's going on, the transcript clearly shows, that the focus of this entire hearing, interview with the juror, was what's going on in the jury room. Although the judge said, I didn't get in with her about what's going on in the jury room. The entire focus was what was going on in the jury room, and she was complaining about, she was being butted up, being in-your-face. She was being tried for her decisions, and that's where her anxiety came from, directly from her decision. Hold on, hold on, Mr. Wilkins. The district court also said, at the very beginning, don't tell me anything about the deliberations themselves. That's right. He did say that, and that's why she was hesitant to get into all the things, but she did say enough for us to know that she was being tried by the other jurors, some of the other jurors, for her decision. It's clear as a bell, and that's why she said, I can't go on. Given the choice, I'll be replaced. But she doesn't have that choice. The judge has to do everything he can, under these circumstances, to make sure that there's a pleasant environment in that jury room. A pleasant environment? A trial judge has to make sure the jury room is pleasant? That strikes me as a bit of an overstatement. I'm sorry, Your Honor? It strikes me as a bit of an overstatement to say that jury rooms have to be pleasant environments. Well, I agree with you. That was an overstatement. You don't have to have a coercive attitude by some of the jurors in that jury room, and some of the things that went on. But nevertheless, a judge can correct that. That's what trial judges do. They correct situations in the jury room so that the minority can be heard by the majority, and their views respected as well. Before your time gets away, I would like for you to tell us a little bit about number 93, particularly as to why any objection to 93 was not waived. Two things, Your Honor, about that. The judge said it's not practical to get her medicine and drive back. That's what he told the lawyers in the courtroom. That was an assumption the judge made, because there's nothing in the record that shows that she would have to drive back. Indeed, the record shows, the affidavit, that she was outside the jury room talking to the deputy, going to get her telephone or cell phone to call a friend. Her medicine was just a phone call away, but yet she was dismissed. Whether or not the judge . . . the defense attorney said, I agreed with that at that time, he did say those words, but that was based on the assumption that she's going to have to leave the courthouse, drive to her house, retrieve her medicine, drive back to the courthouse. All the time, jury deliberations would have been suspended. That's not the case here, but that's what the defense attorney was laboring under. So, is it your view that was an uninformed waiver as to the effect? If he said it. He did say that, but he said at that time. The government says he said he agreed to this before the judge left the jury room. Now, if you look in the record . . . Well, I mean, after they came back, he said, you know, we have no objection to your dismissing the juror with medical needs. He said, we agreed to that at that time, meaning the time before. But there's nothing in the Senate, cited by the government, where any language is there that he agreed the lawyer was simply confused or just mistaken. But in any event, it was not an informed, intelligent and voluntary consent. All right. Thank you very much. Your colleague has some rebuttal time. Stoughton? Stoughton. Stoughton. Stoughton. Stoughton. Well, we'll get it right eventually. May it please the Court. I'm Katie Stoughton on behalf of the United States. With me at counsel's table is Emily Limehouse. I plan to address this morning the issues related to the replacement of jurors 88 and 93, including their affidavits, if the Court has questions about those. Ms. Limehouse will address all the remaining issues. So, the sufficiency of the evidence, the evidentiary rulings, and, of course, our cross-appeal on the restitution issue. We've suggested a time split, but are happy to defer to the Court's discretion, whatever works in terms of answering your questions. Turning first to Juror 88, we believe the District Court correctly determined that Mr. Lafitte waived any challenge to his finding that the juror needed to be excused. How? Well... So, I'm just going to say that strikes, I think, I guess I'll just say, it strikes me that you're right on the medication and wrong on this. I agree 100% that he waived his right to be present when they talked, and I understand your friend on the other side too agreed that. Where do they possibly agree to the judge excusing Juror 88? I mean, you place a lot of emphasis, pretty much exclusive emphasis, on a remark the District Court sort of makes as, I mean, I'm just envisioning this scene, and I guess I, like, I'm just envisioning that the District Court is, if he's not literally standing up, he is starting to stand up and say, I'm going to do this, and I'm going to take action, and he walks out of the courtroom, and no one stands up and says, Judge, what does that mean? Or something like that. But like, other than this, I will say to me, at minimum, fatally ambiguous statement about taking action and whatever the heck that means, I don't understand how they waived the argument. Specifically, we agreed to let you go talk to this juror as long as you made a record at the government's request, but we understood that what was going to happen is after you talked to her, we were going to come back in this room and have a conversation, not you come back and announce that you've dismissed her. Where do they waive that argument? So I think it's important to look at the whole context of the conversation we're having. This discussion about Juror 88 was prompted by her sending a letter to the judge that said, can you please call an alternate? I'm experiencing anxiety, and I'm unable to clearly make my decision. So our whole discussion about 88 is whether she's a viable juror at all. Right, and we're going to get information, because the judge says very appropriately, I give the district court a lot of credit saying, I'm not just dismissing someone because they're anxious, I'm not just dismissing someone, I think the judge even says during this colloquy, I'm not dismissing someone because they're potentially a holdout or disagreeing with people about the evidence, so I'm going to talk to this juror, which seems totally right to me, but that isn't, I'm going to talk to her and then make a decision without talking to any of you before I make my decision, right? I don't see anywhere the court says that's what I'm going to do. I understand, Your Honor, and there is no express statement in the record from Lafitte's counsel, we agree with him on that. I mean, there is, whereas to me it's much clearer, I think you have a much stronger argument that the whole context of the conversation suggests I may well dismiss medication, the person I'm calling medication. There definitely is a whole bunch of people saying, well, if they need their medication, they've got to go. I think your argument that the whole context suggests that the judge might do what the judge did with that juror is fair. I just don't see that for 88. I understand, Your Honor. I think a lot of this is colored by our perception and certainly the court's perception having been in the courtroom in the moment as we're navigating and trying to figure this out. Right. The court Why don't we, just to save some time, why don't we just Sure. agree for purposes of discussion that as to 88, the court would find there is no waiver or no agreement before the judge left the bench to whatever it was he was going to decide. Now we're going to focus on what's the constitutional impairment when the judge has the in-camera interview and makes the dismissal. Sure. We don't need the waiver to win on any of the three arguments with respect to Juror 88. I'll start with the Sixth Amendment argument since that's where Mr. Wilkins focused his time. This argument really applies to both jurors, but there is no Sixth Amendment violation in replacing Juror 88 or 93 because there's no causal link between her dismissal or her request to be dismissed and her views of the evidence. So we have no quarrel with the Brown Model cases. That would be a clear case if we started with what Judge Hytens read initially and didn't look at the prior page because there are two indications that there could be a causal connection. And that's, I think, the dilemma in this case is it's simply not clear cut. So how do you address the two sentences, I started to feel very anxious due to some of the reactions to my decision, and I'm usually strong when someone is butting up what I don't want to be trialed. So how do we reconcile that with what happens on the next page? So the District Court's finding was that the juror was in what the District Court called an emotional meltdown situation. So this is not simply a juror who's expressing that they're feeling uncomfortable in deliberations because they disagree with other jurors. He says she's visibly anxious. She needed a minute to compose herself at the beginning of that interview. This transcript, if you read it through, takes about 45 seconds, but the record says it was a three-minute long interview. He says it was obvious she was under considerable stress. She was in obvious distress and advised the court she was not capable of performing her duties as a juror. And I don't doubt at all that that was the perception of the District Court judge, but if you're defense counsel, you've never been privy to any of that. Understood, but that's by their own consent. They agreed that the best course of action was... No, they agreed to not be present for the questioning. They didn't agree to not have input on what the District Court judge should do in response to these statements. Right. They agreed to not be present, which put the District Court in the position where he was the only person who had evaluated the juror's demeanor and was able to say she is clearly incapable of continuing. She is visibly shaking. She can hardly speak. She's in this emotional meltdown situation. She's anxious. She cannot... But can she get in that emotional meltdown situation because of the way the other jurors were treating her, arguably because of her view of the evidence? It's possible, Your Honor, and I would point the court to... Well, if that's possible, then why is there not a problem here? I would point the court to three different cases that we've cited in our brief where the court says it is possible that some sort of stress or something happening during jury deliberations can lead to an anxiety or some sort of medical issue. But if that medical issue is, in and of itself, severe enough that the juror cannot continue to deliberate, they can be excused without any Sixth Amendment implications. I'd point to the Huntress case in the Fifth Circuit. There were several notes that there were problems with the juror, that he didn't want to participate in the verdict, that he had a problem with the facts and the law of the case. He checked into a hospital during a break in deliberations overnight, and the doctor told the court his condition was brought on by the stress of jury service. But the Fifth Circuit said, we're not going to speculate that that breakdown was just based on the fact that he was a holdout, and there was no abuse of discretion in releasing him based on his physical impairment, his inability to continue deliberating. Why doesn't this feel a lot like Brown to me? This feels very similar to the D.C. Circuit's decision in Brown to me. And I think it's similar in the sense of some of what the juror is saying sounds like just a general problem, but some of it starts to sound adjacent to the problem stems from what I think is the right answer and how people might react to what I think is the right answer. And what the D.C. Circuit says in that situation, you have to err on the side of assuming that it might relate to their view of the evidence, that the tie goes to the Sixth Amendment, the tie goes to the right to the impartial jury, and that if you don't, and I guess this goes back to, and it seems like at minimum we should have all got back in the courtroom and that we shouldn't be having this conversation for the first time on appeal, that the district court judge should have had this conversation with the lawyers before just sending her home. I get it was late, I get it was like two days before Thanksgiving and the district judge wanted to get everybody out of there, but like it feels like this conversation should not be happening between counsel and the bench for the first time on appeal. Well, can I add to that, because it's all intertwined, it circles back to the Fifth Amendment question on the right to be present, and clearly counsel was, I mean, Mr. Lafitte and counsel were present when they had the discussion about the judge interviewing the juror, but it's highly debatable that they were present when the decision was made to dismiss the juror, so it seems like there's a pretty strong Fifth and Sixth Amendment connection here we have to resolve. So if I could address Judge Hyten's question on Brown, and then I'll go to the Fifth Amendment issue. I would point to the D.C. Circuit's decision in McGill, which of course followed Brown, where they said even if a known holdout juror requests dismissal because they're having a heart attack, Warren Brown doesn't prevent that dismissal, so you can be so anxious and so stressed because you're the known holdout juror. Your heart's at 150 or, right. But if you're having a heart attack, no reasonable court is going to say, I'm sorry, you've got to come back and continue deliberations. If you go into premature labor because you're stressed because you're the only holdout juror, the court's going to excuse you, and what the court is saying here is she was incapable of functioning. She told me twice before I interviewed her and during the interview that she could not clearly make a decision, she couldn't uphold her duties as a juror. That was the district court's perception, certainly, which it has reiterated several times. Where did she say that in this transcript? That I can't make a decision? She said, her note said, I'm unable to clearly make a decision. The note, okay. But not during the interview. Yes. The interview she said she cannot continue to perform her duties as a juror. So I think the McGill case says, it may be caused by stress, but at some point there's an independent medical need that's legitimate enough that the juror's got to be excused, and the district court didn't clearly err in finding that that's the status that this juror was at. Turning to Judge Agee's question on the Fifth Amendment issue, I presume if the court finds that Mr. Lafitte did not consent to not being present, it's going to find he was not there and neither were his counsels in the moment that the judge made the decision to excuse the juror. And Runyon says that's a Fifth Amendment violation. Yes, that's right, Your Honor. So we have argued this under plain error review, so Mr. Lafitte would have to show an effect on his substantial rights, but even under a harmlessness beyond a reasonable doubt standard for the government, we think we would win under either. Really? In terms of knowing- Could you try- Sure. I will describe myself as politely skeptical of your harmless error argument, but I invite you to try to convince me that I shouldn't be. Sure. So we think the error is harmless beyond a reasonable doubt because here the court came back and said, I've excused Juror 88, she's in this emotional meltdown. Defense counsel objected, and the court said at JA 2286, had I come back and told you she was emotionally incapable of functioning and that she asked me again to remove her, you would have objected to that? Defense counsel said, I think we would have said that it's a hung jury. And the court said, it's not a hung jury, I have alternates, which is an accurate statement of the law- Okay. So for purposes of analyzing the harmlessness of the possible Fifth Amendment violation, I guess, right, what we have to hypothesize is that the district court did what it was supposed to do, which is come back in the courtroom and say, I'm going to dismiss her based on what I just heard, and that lawyers make the arguments, and the court says, yeah, but I'm still going to dismiss her. Right. And you said that would be harmless because if he'd done that, that clearly would not have been reversible error in your view. Yes. Okay. The harmlessness on the Sixth Amendment is a different question that I'm happy to address, but even in terms of the Runyon analysis of whether there's an effect on the substantial rights from a Fifth Amendment violation, the alternate was selected along with the other jurors and the alternates during voir dire, where the defendant and his counsel were present, they sat through the same opening and closing charges, they sat in the jury box for all of the trial, they affirmed the verdict when they were polled after the verdict was returned. So we think under Runyon- But that's going to be literally true in any case that ever comes to us on appeal, because if the jury hangs or acquits, there's no appeal. So the only situation in which something like this would ever come up on appeal is basically this situation. It could. I mean, I think where you might have- No, literally, can you think of another way this could possibly come up before us on appeal? Because if a jury acquits, there's no appeal. That's right, Your Honor. I think where you might have an effect on substantial rights is a case where perhaps the replaced juror was substituted with an alternate who maybe hadn't been sequestered or where there was some sort of evidence that that juror had been tainted in some way. But here you have jurors that sat through everything the jury did. They were sequestered. They were put in a room. They were instructed not to speak to anyone. And so I think under Runyon, it's clear that there is no issue with having substituted either juror with jurors who had been sequestered and who had sat through the trial just because Mr. Lafitte and his counsel weren't present at the time of the discrimination. Of course, that presumes there was no error in removing the juror to start with. That's right, Your Honor. So how would you do the harmlessness under the Sixth Amendment? Assume, for purposes of this question only, that we were to conclude there was a Sixth Amendment violation. How would you do the harmlessness then? So I think that a Sixth Amendment error can be harmless or have no effect on substantial rights if there's an independent, legitimate basis for excusing the juror. And so in the McGill case that I discussed earlier, the district court, I'm sorry, may I answer the question, Your Honor? Go right ahead, please. The district court said, I'm removing the juror for a juror misconduct issue or a failure to follow instructions. And independently, I'm removing the juror because he's removed his jury notes from the jury room, which he shouldn't have done. So on appeal, the defendant says, this juror, there were notes, like it was pretty clear this was the holdout juror. There's a Sixth Amendment issue here under Brown, and the D.C. Circuit said, we don't even have to address the Sixth Amendment because the dismissal stands on that independent basis. So I think if the court were to find there was an independent, legitimate basis supported by Rule 24, that you don't even have to address the Sixth Amendment issue, even if there's an error. However, I will acknowledge the Second, Ninth, Eleventh, and D.C. Circuits have all just summarily remanded where they found the Sixth Amendment error without doing any harmlessness inquiry. I'm happy to answer any questions I haven't addressed, Juror 93, yet. All right. Thank you very much. Thank you. Ms. Limehouse, if you'll give us your part, including whatever you want to say about the cross-appeal. May it please the court, I had intended to address the arguments related to potential bias and motive evidence, then the sufficiency of the evidence arguments with respects to Counts 2 and 3, and then our cross-appeal, unless the court would have me address matters in a different order. With respect to the arguments related to what the defense counsel argues is evidence of bias or motive, the District Court did not abuse its discretion by excluding evidence that was not prohibitive of bias or motive and would have resulted in confusion of the  This is the bank board member's question. That's correct. This is direct testimony of the defendant's witnesses during direct examination, and the Charlie Lafitte memo is what I'll call it. Related to both, I think it's important to frame how these issues related to the sale of the bank were presented during the entire case. During the government's case in chief, we called five board members. The defense asked three of those board members about the potential sale of the bank, and the government objected based on relevancy. The court allowed that line of questioning as proper cross-examination under 608, allowed the defense to impeach the government's witnesses related to issues surrounding the sale of the bank. The evidence was not excluded. In support of their appeal here, the defense cites a portion of Charles Lafitte III's testimony. That testimony was actually related to the shareholder repurchase program and not the sale of the bank. The court excluded the testimony about the shareholder repurchase program as an improper attempt to impeach a government witness using extrinsic evidence in violation of 608B. The issue came up again during Charlie Lafitte's testimony. This was a question about a, quote, riff in the board. The court excluded that testimony as another improper attempt to impeach the government's witnesses with extrinsic evidence. The question was later brought about this 2020 board retreat, and the court asked defense counsel if it was the same issue. After defense counsel said that it was, the court again held that it was improper impeachment under 608B. The words motive and bias, the argument about motive and bias, was not presented to the court until the testimony of Gray Henderson. It was actually during a break in the testimony. The court stopped, and that's at J1674, and said he wanted to make sure he fully understood what counsel's arguments were and give them an opportunity to explain why this evidence was admissible. At that point, the defense counsel argues that it's relevant to motive or bias, and the court's analysis shifts from whether it's proper impeachment under 608B to determining whether the evidence they sought to admit was probative of motive or bias. The court at that point gives defense counsel a half a dozen opportunities to describe to the court why evidence about the potential sale of the bank through its own witnesses was probative of motive or bias. I'll point the court to JA 1677 through 1680, and on six different occasions, the court seeks to elicit from defense counsel an explanation of why this evidence is probative of motive or bias. Despite numerous opportunities to do so, defense counsel could not articulate how this evidence they sought to elicit established motive or bias, and that was a correct finding. There's no abuse of discretion in that finding. For the court to determine that the evidence they sought to elicit was probative of motive or bias, it would have had to establish that there was some board retreat in 2020 during which certain board members expressed a desire to sell the bank, that a year later when Murdoch and Lafitte's criminal conduct became known to the bank, they used that conduct as a pretext to fire Russell Lafitte from the bank's board, that a year later when he was being tried for that criminal conduct, the government called the same board members that wished to sell the bank, and that they had a motive and bias to testify falsely against Mr. Lafitte to advance their interest in selling the bank. As the court found, this is just too remote, too attenuated, and too speculative to be probative of motive or bias, and therefore should have been excluded under 401. The court also made findings not only under 608B and 401, but also under 403. The court found that if the court were to allow the defense to elicit this testimony from its own witnesses via extrinsic evidence, that it would create a trial within a trial, what the court called was a circus. The district court has wide latitude to put bounds on motive and bias evidence. Even if this court were to find that that evidence was relative to motive or bias, the court would abuse its discretion in finding that it would have created confusion with the jury and a trial within a trial. Your time is fleeting if you want to get to any of the other things. I'm going to turn to the cross appeal, if I may. I'll address the sufficiency of the evidence arguments briefly, Your Honor, if I may save my rebuttal time to deal with the cross appeal, if Your Honor wishes. Just briefly. I think if you want to deal with the cross appeal in rebuttal, you better say something about it now. Yes, Your Honor. Otherwise, there's no way the opposing side can respond to it. Thank you, Your Honor. Yes, Your Honor. The district court, we believe, plainly and reversibly erred by waiving interest on restitution without first making the requisite factual finding that Mr. Lafitte was unable to pay interest on restitution. Of course, 3612F requires the court to impose- But the government made no objection. That's right. That was absolutely our error. We should have objected during the court's oral pronouncement. And the government constantly argues we should deny relief to criminal defendants on claims that they're forfeited because forfeitures are really, really, really, really, really tough. This is a little bit in tension with what the government says in virtually every criminal case. I understand. I understand, Your Honor. But our failure to object should not be held against the victims whose losses would not be made whole. They would be out about $190,000 a year. Well, hold on. Hold on. That presupposes the court couldn't have made the findings. Once the court makes the findings, you're presupposing that the error is that the district court waived restitution. Maybe the error is the district court did not explain why it was waiving restitution. So the prejudice argument you just started to make presupposes the court could not have done this. Sure. But it's based on everything that was presented to the court, both in the pre-sentence report and at sentencing. All the discussions on the record about the defendant's financial condition do not support a finding that he was unable to pay interest on restitution. In fact, there was a discussion about the defendant's ability to pay forfeiture in addition to restitution. Defense counsel argued that Mr. Lafitte would not be able to pay both. The court acknowledged that it had adopted the findings in the PSR as findings of fact for purposes of sentencing. It highlighted the defendant's $10 million in assets and $5 million in liabilities and that the restitution judgment was about $3.5 million. And the court doubted that there would be any issue in the defendant being able to pay both restitution and forfeiture. And so I think not only does the PSR not support a finding that he was unable to pay interest on restitution.  But we're not making any findings on the appellate level in the first instance. Correct. And while the government did not object and should have during the court's oral pronouncement, we think the court's failure to make a finding before sort of checking the box that interest was waived was a plain error and necessitates this court to... Do you have any sense, it looks to me from trying to figure out how this happened, is that somehow the form the court used is like a screwed up, tweaked, modified version of an official form that omits a box? Well, I will say this isn't in the record, but we did of course research whether this was the form that's typically used. This district court has used the same form in restitution judgments prior to this case and since this case. So it's an irregular, modified version of an official form? There is no check box in this form. But there is an official form that does have a check box. That's correct. The district court form does have a box for a finding, not just that interest was waived. But we argue that even if there was a checked finding box on this judgment, that that would not be sufficient to satisfy what the statute requires because there's absolutely no discussion on the record of his financial position. Thank you very much. Thank you, Your Honor. Mr. Neiman, we'll be glad to hear from you. Thank you, Judge Agee. The government's cross appeal is meritless and Mr. Wilkins and I are content to rest on what we said in our briefs about it. We'd like to use the limited time we have in rebuttal to return to the more significant issues in this case. That is to say the dismissal of these two jurors. We haven't said much about juror number 93 today. Even if the government were right to say that plain error review applies as to 93, we think that that's a basis for a new trial, even under a veto. No, the government doesn't say it's forfeited. They say it's straight up waived because we agreed to it at the time. We agreed to it at the time. It's not a forfeiture. That's a straight up waiver. Yeah. I understand the waiver issue, Judge Heitens. We've explained in our brief why we believe that's not an effective waiver. It's not knowing. It's after the fact. Nonetheless, I agree. If it's a waiver, we're out of the law now. Can I ask you just one question about waiver? You suggest that it's a problem that there's no evidence Mr. Lafitte agreed to it. Do you have any authority for the proposition that this is the kind of waiver that can only be made by the client, that it's akin to the right to testify, the right not to plead? Almost nothing has to be made by the client. It strikes me as implausible that this is something the client has to do. There is a second circuit dissent that I believe we've cited, but it's a dissent that we acknowledge. We are extrapolating that rule from that line of precedent. We'd be asking the court to extend that line of precedent. Why don't we move on to number 88? Yes, Your Honor. 88 provides a much clearer path to resolving the case. The government has conceded that the Sixth Amendment claim as 88 is preserved. The government hasn't had effective answers to the court's questions about its preservation argument as to the Fifth Amendment claim relating to 88. The question then becomes, how do the claims relating to 88 get resolved by this court? Let me start with what Judge Hyten said was, in his mind, the most difficult question in the case. What was the trial judge supposed to do when at the end of this interview, the juror 88 said that she was unable to serve in response to that question? At least two responses on that. First, the first comes from the Fifth Amendment. The Fifth Amendment right to be present is clear, so the absolute wrong response from the judge was to simply dismiss the juror at that point. Mr. Lafitte had a Fifth Amendment right to be present when the judge made his decision about whether to dismiss her. The judge had an obligation under the Fifth Amendment at that time to go back into the courtroom, to have the court reporter read through the interview, and then to consider the arguments of counsel about whether number 88 should have been removed based on the full context of that interview. I'd submit that there's a substantial possibility that if the court reporter had read back the entire interview of 88, the outcome would have been different. How do we know that? Because when the judge came back into the courtroom, he no doubt said these things like 88 could hardly speak to him, 88 was shaking. He did not say to the parties that 88 had said all these things that are also in the record. If he'd come back, that would solve the Fifth Amendment problem, I think, but not necessarily the Sixth Amendment problem. I'm not sure I understand. If the judge had come back into the courtroom before dismissing the juror, and then had that discussion, dismissed her anyway, I'm saying that seems like it would solve the Fifth Amendment problem, but not the other. That's correct. But my point is the Fifth Amendment problem alone was harmful to error and cause for a new trial. Well, not necessarily. I think what Judge Agee may be saying is not necessarily, so let's assume he comes into the courtroom. Look, as a descriptive matter based on what the trial judge says, let's just hypothesize that I'm pretty confident what would have happened is he would have walked into the courtroom and said, I'm going to dismiss her, and then the lawyers would have made arguments and he would have said no, based on what the trial judge says when he comes back. Which brings me to the question, the real question is whether that's a Sixth Amendment error, because I think the government's got a pretty good harmlessness argument on the Fifth Amendment, because based on my reading of the transcript, I don't feel particularly doubtful what the trial judge would have done had he come back into the courtroom before dismissing her. Yeah, so I do think the Fifth Amendment problem is harmful error, because the trial judge had not revealed to the parties, and perhaps had not considered himself, these other things that the juror was saying. But separately from that, the Sixth Amendment violation here was also harmful error that requires a reversal. The government's take is, well, that there were these things that the juror said that were independent reasons to reverse her, but that leads to the second thing that the judge should have done during the interview, which was to say, when she said, I'm going to give you an extra two minutes, because we want to hear this. When she said, I'm unable to serve, to ask himself why. And the answers are apparent in the transcript. She had said, I started feeling anxious due to some of the reactions to my decision. The government cited a D.C. Circuit decision that declined to find a Sixth Amendment violation when the connection between the reason for dismissal and the juror's view of the evidence was speculative. There's no speculation on this record. Juror 88 herself articulated the causal connection. She told the judge, I'm feeling this anxiety due to the reactions to my decision. That paired with the fact that she immediately then said, I don't want to be removed, but I'm usually very strong when being butted up against, but I don't want to be trialed for my decision. All of those data points confirm that the reason why the note was sent in the first place and the reason why, ultimately, juror 88 said, I'm unable to perform, is because of the experience that she had in the jury room. Let's just hypothesize that the district court concludes the following. This juror is shaken. All the things that the district court said. This person is not capable of deliberating. I cannot let this person deliberate. But also, I can't conclude that the reason this person is incapable of deliberating is unconnected to their views of the evidence. Let's posit the district court thinks both of those things are true. You seem to be resisting saying this. Your view, then, is they have to dismiss her and declare a mistrial, right? If the district court believes those two things are both true, is that what the district judge does? Dismisses the juror and declares a mistrial? I think that's certainly one of the things the judge could have done. What else could he do in that situation? The extraordinary facts of this case suggest that, among other things, here at 845 at night on the night before a holiday. Take a night. Let's calm down. Yes, absolutely. We provide instructions to the entire jury saying treat each other with respect. We're coming back tomorrow and we'll see if things are better then. Yes. But you haven't claimed that's some sort of independent error. Your claim goes to dismissal. Yes. Our point is that her dismissal was error. My response to Judge Hytens just suggests the judge did have a lot of discretion in terms of how he could deal with this issue. But what he did not have discretion to do is simply outright dismiss her in these circumstances. Unless there are further questions, thank you. Thank you very much. All right. Ms. Limehouse, you have rebuttal on the cross appeal, which I remind you is not surrebuttal, but the judges, of course, can ask you about anything. Yes, Your Honor. We just want to clarify one matter. The error we are claiming is not in waiving interest. It's in failing to make the requisite factual finding to support that waiver of interest. If the court has no further questions with respect to our cross appeal, we ask that the court vacate the restitution order and remand for the limited purpose of determining whether Mr. Lafitte had the ability to pay interest on restitution. Thank you. All right. I want to thank counsel for their excellent arguments in this case, and we're going to come down and greet counsel and then move on to our next.
judges: G. Steven Agee, Stephanie D. Thacker, Toby J. Heytens